IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Denise M. Marusco Godfrey        :    No.   15-cv-6477
     and
Byron J. Godfrey, h/w
      v.
Upland Borough,
Delaware County Regional
Water Control Authority,
Catania Engineering Associates, Inc.,
Thomas Kennedy, Charles J. Catania,
Parker Ferguson, Edward Mitchell,
Leyland Hunter, Robert O'Connor

O R D E R

AND NOW, this _____ day of _____, 2016, upon

consideration of the Motion for Leave to File Third Amended Complaint,

and the response thereto, said motion is GRANTED. The Third Amended

Complaint is filed as of the date of this ruling. As the parties have filed

numerous motions to dismiss or to strike, which have been ruled on or

the arguments for which have been appropriately addressed in the Third

Amended Complaint, Defendants are ordered to file answers within 20

days of the date of this order and may not file any more motions to

dismiss or to strike.

IT IS SO ORDERED.

BY THE COURT:

_____
Cynthia M. Rufe, U.S.D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Denise M. Marusco Godfrey            :   No.  15-cv-6477
    and
Byron J. Godfrey, h/w
     v.
Upland Borough,
Delaware County Regional
Water Control Authority,
Catania Engineering Associates, Inc.,
Thomas Kennedy, Charles J. Catania,
Parker Ferguson, Edward Mitchell,
Leyland Hunter, Robert O'Connor

Motion for Leave to File Third Amended Complaint

In support of this motion, Plaintiffs aver as follows:

1.  Defendants filed motions to dismiss and to strike.

2. The Third Amended Complaint a) changes the damages sought in

the fraud claim so attorneys fees are not sought, b) eliminates the claim

against O'Connor, c) names individual DELCORA Defendants instead of

DELCORA as a Defendant in the fraud claim, d) includes Catania

Engineering Associates, Inc as a Defendant in the Due Process claim.

and e) comports the allegations in the Clean Water Act claim with the

court's order to allege that  on September 19, 2016, Marcello Mollo,

counsel for the Department of Justice, stated that the consent decree

does not address backup into private homes, could not state whether the

consent decree will help Plaintiffs with their problems, that the consent

decree does not address problems experienced by Plaintiffs, nor will it

help them, the violations affecting Plaintiffs are outside the scope of the

government's investigation in that case and that while the government may have dilligently prosecuted the consent decree it did not diligently prosecuted the problems specific to Plaintiffs' property, their causes or the relief Plaintiffs need and seek.

3. The amendments make some of the arguments in those motions moot and conforms the matter to the evidence.

WHEREFORE, Plaintiffs respectfully request that the court grant the motion and rule that the Third Amended Complaint attached to the motion be field as of the date of its ruling.

Date: December 1, 2016     s/J. Michael Considine, Jr.
                                  J. Michael Considine, Jr., P.C.
                                  1845 Walnut Street, Suite 1300
                                  Philadelphia, PA. 19103
                                  (215)564-4000
                                  PA Attorney ID No. 37294
                                  Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, J. Michael Considine, Jr. hereby certify that I filed electronically the Motion for Leave to File Third Amended Complaint and transmitted it to the following counsel of record on the date indicated below: Kelly Hayes, McNichol, Byrne & Matlawski, P.C., 1223 N. Providence Road, Media, PA 19063, Robert P. Di Domenicis, Holston & Associates, 1 South Olive Street, Media, PA 19063 and Richard J. Davies, Drew M. Rothman, Powell Trachtman Logan Carrle and Lombardo, P.C., 475 Allendale Road, Suite 200, King of Prussia, PA 19406.


Date: December 1, 2016     s/ J. Michael Considine, Jr.
                                    J. Michael Considine, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Denise M. Marusco Godfrey : No. 15-cv-6477
        and
Byron J. Godfrey, h/w
        v.
Upland Borough,
Delaware County Regional
Water Control Authority,
Catania Engineering Associates, Inc.,
Thomas Kennedy, Charles J. Catania,
Parker Ferguson, Edward Mitchell,
Leyland Hunter, Joseph Centrone,
Robert A. Powell and John Sucher

## THIRD AMENDED COMPLAINT
### PARTIES

1.      Plaintiffs, Denise M. Marusco Godfrey and Byron J. Godfrey,

husband and wife, are citizens and residents of Pennsylvania who at times

relevant to this matter, have resided at 310 10th Street, Upland, Delaware

County, PA 19015.

2.      Defendant Upland Borough (hereinafter UB) is a municipality in

Delaware County, PA whose address is 224 Castle Ave, Brookhaven, PA

19015.

3.      Defendant Delaware County Regional Water Control Authority

(hereinafter DELCORA) is responsible for  water infrastructure in Delaware

County whose office is located at 100 E 5th St, Chester, PA 19013, and

which is  municipal authority created under the Pennsylvania Municipal

Authorities Act, 53 Pa. C.S. §§ 5601-23, a "person" within the meaning of

Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

4.Defendant Catania Engineering Associates, Inc. is a business

incorporated in Pennsylvania Engineer whose address is located at 520 McDade Boulevard, Milmont Park, Delaware County, PA 19033.

5.Defendant Thomas Kennedy is an adult individual who at all times relevant to this matter acted as a plumber for Upland Borough, 224 Castle Avenue, Brookhaven, PA 19015.

6. Defendant Charles J. Catania was an adult individual who acted as council member and engineer for Upland Borough during times relevant to this matter and whose address is 520 McDade Boulevard, Milmont Park, Delaware County, PA 19033.

7. Parker Ferguson is an adult individual who was during time relevant to this matter building inspector for Upland Borough, whose address is 224 Castle Avenue, Brookhaven, PA 19015.

8. Defendant Edward Mitchell is an adult individual who acted as council member for Upland Borough during times relevant to this matter and whose address is 520 McDade Boulevard, Milmont Park, Delaware County, PA 19033.

9. Defendant Leyland Hunter is an adult individual who acted as council member for Upland Borough during times relevant to this matter and whose address is 520 McDade Boulevard, Milmont Park, Delaware County, PA 19033.

10. Defendant Robert O'Connor is an individual who resides in Pennsylvania and was at all times relevant to this matter counsel for

Upland Borough, whose address is 341 West State Street, Media, PA 19063.

11. Defendant Joseph Centrone at all times relevant to this matter was employed by DELCORA, whose office is located at 100 E 5th St, Chester, PA 19013, acting within the course and scope of his employment.

12. Defendant Robert A. Powell at all times relevant to this matter was employed by DELCORA, whose office is located at 100 E 5th St, Chester, PA 19013, acting within the course and scope of his employment.

13. Defendant John Sucher at all times relevant to this matter was employed by DELCORA,whose office is located at 100 E 5th St, Chester, PA 19013, acting within the course and scope of his employment.

## JURISDICTION AND VENUE

11. Jurisdiction is based on federal questions, violations of the 1st & 14TH Amendments and  pursuant to 33 U.S.C. §§ 1319(b) and (d), and 28 U.S.C. §§ 1331, 1345.

12.Venue is proper in the Eastern District as all the events relevant took place in   and all the parties reside within the Eastern District.

13.At all times relevant to this matter Defendants acted under color of state law within the course and scope of their duties to enforce such law.

## FACTS

14. In May 1990, Camillo J. Marusco, Jr. (hereinafter CJM) father of Plaintiff Denise M. Marusco Godfrey (hereinafter DMM) purchased premises (hereinafter "the premises") located at 310 10th Street, Upland,

PA 19015, within Upland Borough. He put the title of the premises in the name of his other daughter, Deana L. Marusco (hereinafter DLM) and on August 17, 1990, she was granted the premises by recorded deed.

15.CJM built a residence on the premises. A building permit was issued August 30, 1991 and a Certificate of Occupancy on October 25, 1991.

16.On June 10, 1991 an easement, with a seal stating "Charles J. Catania", (hereinafter CJC) was signed with a signature purporting to be that of DLM. Catania, on behalf of Delaware County Regional Water Control Authority (hereinafter "DELCORA") and Catania Engineering Associates, Inc., 520 West Mac Dade Boulevard, Milmont Park, PA 19033 (hereinafter "CEA") put his seal on the easement with the name CEA. The easement granted rights to install and use pipes and related water control infrastructure on the premises to Defendant Delaware County Regional Water Control Authority (hereinafter DELCORA"). Exhibit A.

17.DLM did not sign the easement, never authorized anyone to sign it on her behalf and neither she nor Plaintiffs knew it was signed on the date it was signed or when it was recorded on November 2, 1992. DLM told DMM she did not sign it in a text message on December 5, 2013. DLM also told Plaintiffs she did not sign the easement.

18.Defendant DELCORA through its agent Defendant Catania Engineering Associates, Inc. or some other person on their behalf forged the signature of DLM on the easement, knowing it was not her signature, and never sent DLM or Plaintiffs notice the easement had been signed or

recorded. The identity of the notary who notarized the signature cannot be determined from the document, which does not have the normal notary seal. Plaintiffs are unable to determine the identity of the alleged notary. When DMM called Catania's office to ask who the notary was, an employee told her "we had no notary at the time." The notary seal does not state the notary's name or date their commission expires. The notary knew DLM did not sign it.

19.On December 5, 2013, Plaintiffs first discovered the easement, which purported to give Defendant DELCORA the authority to build pipes and structures on Plaintiff's property within the easement that have contributed to the increased water pressure leading to stormwater and sanitary water problems on the premises..

20.MM has lived on the premises continually since the house was built there alone, until she married. Her husband Plaintiff Byron J. Godfrey (BJG) and she have lived there together since November 2010.

21.In August 2013, the premises was transferred by DLM to Plaintiffs..

22.In April 1, 2004 or 2005, DMM saw water in the basement bathtub, and on    the floor and in the heating room of her basement

23.The house on the premises was built with a floating floor and French Drain but no sump pump.

24.During the period 2005-2010, DMM did not use the bathtub or toilet in the basement and put plugs in the drains for both.

25. In 2004 or 2005, Mr. Mayo, the plumber for Defendant Upland Borough, came to the premises and took out five 5-gallons buckets of stone from the clean-out valve under the basement floor.

26. The valve was installed to prevent municipal sewer water from entering into the house.

27. While he was doing so, he broke off the hinge to the valve in such a way that municipal sewage water was no longer prevented from coming, or more frequently and in greater volume came, into the premises.

28. In July 2010 the road in front of the premises was damaged due to water pressure caused by underground infrastructure installed by Defendant DECORA as well as heavy rain.

29. Due to Defendant DELCORA's' and/or Defendant Upland Borough's construction of storm water and sewage water systems, a watershed of 30 acres empties into a 3 acre area and put extremely high water pressure on the premises.

30. On August 14, 2011, water gushed like a fountain from manholes in the street in front of the premises. DMM spoke to an Upland Borough employee named Chuck (last name unknown), about the problem.

31. In July 2010 Plaintiffs installed a sump pump on the premises.

32. In June 2013 there was brown muddy water in the bathroom and laundry room causing Plaintiffs to remove over 12 shop vacs worth of water. The water was both storm water and sewage water. Defendant Kennedy told DMM the water was tested and had high level of ammonia.

In that month DMM spoke to Alex of the problems and he said DELCORA would have its pipes (both within Plaintiffs' property and outside Plaintiff's' property) lined. On June 7, 2013 DMM spoke to Charles Catania who told her to call DELCORA, and to Edward Mitchell, Upland Borough Council President, about the problem. Thomas Kennedy was in Plaintiff's basement that day and called Parker Ferguson, Upland Borough's Building Inspector, and told him to call the Superintendant of Upland Chester Community Charter School, 1100 Main Street, Upland, to control the waters coming down Main Street.

33. In July 2013, Defendants through its agents lined sewer lines at, near and above-stream from the premises, raising the water table on and water pressure against the premises at times of heavy rain.

34. On June 20, 2013 Defendant Upland Borough sent a letter to DMM stating there was a crack, or two cracks, in the sewer line lateral on the premises and requiring her to obtain a certification that the sewer line on the premises is in proper working condition.

35. Plaintiffs consulted with at least 6 experts, all of whom said the pipe was fine, there was no crack or leak from it and that they could not fix the problem with water backup or water pressure from the storm sewer and sanitary sewer. Each said they could not provide such a certificate because the problem was not with Plaintiff's system but with the infrastructure created by defendants Upland Borough and DELCORA.

Each said the problem was backup pressure from water from the municipal storm and sanitary sewer systems.

36.Plaintiffs asked the experts to state in writing that the problem was with the systems created by UB and DELCORA, but, as they regularly did business in Upland Borough and in Delaware County, they would not, nor would any provide the certificate requested. After a reasonable effort over a substantial period of time, Plaintiffs were unable to provide such a certificate, although they provided a NASSCO report.

37.Although every expert they consulted, who examined the area of the alleged crack told Plaintiffs there was no such crack they could see after extensive examination with cameras, Thomas Kennedy Plumbing Inspector for Upland Borough, and agent for Upland Borough, maintained the problem was caused by such a crack.

38.On or about June 27, 2013 a plumber from Pipeline Drain Cleaning inspected the area of the alleged crack which was in the lateral and took videos and gave them to Defendant Kennedy.

39.Plaintiffs requested the pictures from said plumber and Thomas Kennedy; both refused to provide Plaintiffs with any pictures despite repeated requests.

40.Despite no evidence that there was any structural or other problem on Plaintiff's premises, employees of Defendant UB brought charges on or about October 21, 2013 having to do with a Certificate of Occupancy and Lateral Inspection against DMM. The Upland Borough Ordinance,

adopted January 10, 2012, requires the owner to obtain a Certificate of Lateral prior to sale, §150-3(B), testing upon sale , §150-9, and after inspection, for the Borough Engineer to issue a Certificate of Lateral Compliance once testing has proven compliance. §150-12. DMM was not required to comply because no sale was pending, she was a grantee, and did not seek to sell the premises with her husband after they bought it. Despite compliance, the Borough Engineer refused to issue a Certificate of Lateral Compliance. The statute, Upland Borough Ordinance, §150-1 though 21, applies to grantors only and not to grantees. DMM has only been a grantee, on June 20, 2012.

41.Defendants refused to provide the photographs or any other physical or testimonial evidence in support of these charges despite requests from DMM.

42.After 4 or 5 continuances, with no testimony ever given, on October 29, 2014 DMM was found not guilty of all charges.

43.Plaintiffs repeatedly spoke up in public and sent letters complaining of the situation with her premises described above to Defendants during the period 2010-present.

44.On October 1, 2011, Plaintiff Byron J. Godfrey (BJG) complained about the water problem at an Upland Borough Council special meeting regarding a new ordinance regarding sewers. He was removed from the podium after speaking for 3-4 minutes while he was showing a sewer map of the Borough.

45.During the period 2004-October 2013, Plaintiff DMM called or spoke to employees of DELCORA, including Joseph Centrone, and Upland Borough, including Borough Manager Shirley Purcival, Building Inspector Parker Ferguson, Mayo and Thomas Kennedy (oral communications, phone calls and text messages including one on August 13, 2013 stating in essence no water could flow out of her lateral because of the water pressure from the pipes below, after which DELCORA trucks arrived at the scene), about the problem with water on her premises, the water gushing from a manhole in the street in front of her premises and what Defendants would do about it.

46.In two conversations with Thomas Kennedy, he threatened to call police in response to the complaints by DMM about the water problems.

47.On September 11, 2014, Thomas Kennedy brought a female Upland Borough police officer into the house on the premises while DMM was present.

48.Before the charges against DMM were dismissed and she was found not guilty, Thomas Kennedy demanded that she tell him the name of any expert who took pictures of the lateral line on September 11, 2014. DMM told him when he would be there and Thomas Kennedy then appeared in her house that day with the female police officer.

49.On three occasions Thomas Kennedy came to the premises while Plaintiffs' experts were examining the area of the lateral.

50.On September 13, 2013, Thomas Kennedy showed DMM what was alleged to be a videotape or photograph of the lateral on his cell phone but refused to give her a copy after repeated requests or let her watch the videotape or see any photograph. In April, 2014, he admitted a video DELCORA took on the premises was inconclusive.

51.Charges filed by Defendant UB against DLM on October 21, 2013 for Lateral Inspection were dismissed December 4, 2013.

52.On November 1, 2013, counsel for UB stated that Thomas Kennedy alleged that Plaintiffs' lateral was broken in 2 places and was continuously dumping sewage into the ground. Despite the repeated requests of Plaintiff, no proof of these allegations was ever provided.

53.On November 5, 2013, Plaintiff BJG delivered a letter to Defendant UB asking how Plaintiffs should get the storm sewer upgraded. There has been no response.

54.On December 11, 2013, DMM filed a written complaint regarding the forged easement with the Chester and Upland Borough Police Departments. No action has been taken by either as a result.

55.On December 20, 2013, DMM wrote Thomas Kennedy a letter complaining about the forged easement. It was returned unclaimed.

56.On April 30, 2014, the manholes in the street in front of the premises were spewing storm and sewage water like a fountain, and on May 1, 2014 the premises' basement was completely covered with 2-3" of water.

57. In November 2013 Thomas Kennedy told Plaintiffs he would have the premises condemned.

58. DMM has put plugs in the lateral and in the toilet and bathtub to block storm sewer and raw sewage water from coming up through the pipes into her basement as it has many times since 2004.

59. Experts Plaintiffs consulted said nothing could be done on the premises to keep storm and sewage water from entering their basement and that the proper remedy was to install a pumping station and make structural changes to the systems outside the premises, which Plaintiffs cannot do.

60. On June 30, 2015, 3 manholes in the street and sidewalk out in front of the premises spewed sewer water like a fountain. DELCORA"s pipe was cracked and fissured until July 2013 when it was lined and as a result 3 manholes spewed water when prior to that only 2 manholes spewed water.

61. Plaintiffs no longer use the bathtub or toilet in the basement since to do so increases the risk the valve will open beneath them allowing sewer and storm water to reenter the premises,

62. On June 1, 2015 Plaintiffs obtained appraisals to determine the value of the premises under two circumstances: 1) "as is" with the problems described above and 2) if it had no such problem. The appraisal indicated the value of the premises "as is" is zero since disclosing the history outlined above is required if the house is to be

sold and no reasonable buyer will buy the premises. Without the problem, the value is $157,000.

63.Plaintiffs have spent over $60,000 for plumbing and engineering experts and legal fees in an effort to resolve the problem.

64.No expert told Plaintiffs they can fix the sewage water problem. The NASSCO report stated there was no defect in Plaintiff's lateral line, according to TLC Drain employee Richard Melle.

65.On November 13, 2014, Thomas Kennedy put an orange sign on the premises stating "This Building Cannot Be occupied As It Is  and Is Considered Not Fit for Occupancy Until Conditions Were rectified.. Needs Lateral Inspection and CgO.Borough of Upland." It had Defendant Leyland Hunter's name on it. Defendants have never ordered that the sign be removed or taken down or that the order on the sign is no longer in effect. The sign is a condemnation of the premises. At the time many lateral inspections had been done and one more was not needed.

66.On February 11, 2014 Robert A. Powell of DELCORA wrote Plaintiffs a letter stating DELCORA did not have a deed easement regarding the premises, despite the filed easement in its name.

67.At a February 10, 2015 meeting of the Upland Borough Council, the Upland Borough Council condemned the premises and it was revealed for the first time that Defendant UB was told by its engineer not to build on the premises before any house was built there. No UB employee ever

informed CJM, Plaintiffs or DLM of this before the house was built or transferred to Plaintiffs.

68. The premises, being condemned, are unable to be resided in without the storm and sewage water problem causing a significant health risk to inhabitants, and no repairs to the premises can be done, despite repeated efforts by Plaintiffs to remedy the problems.

69. On May 14, 2015, counsel for Defendant UB wrote Plaintiffs and stated UB will no longer enforce the ordinance against them.

70. In September 2013 construction was completed on a charter school at 11th and Main Street, Upland Borough, Upland, PA, upstream from and discharging groundwater onto Plaintiff's premises. Since it was constructed the problems with groundwater on Plaintiffs' premises have significantly increased.

71. On November 12, 2014, Plaintiff BJG received a message on his answering machine from John Sucher stating "his guy" from DELCORA said they should get their lateral fixed "or they would be in deeper shit" than they were already in.

72. On or about May 2014, DMM attended an Upland Borough Council meeting and asked Catania, who was both a council member and worked through his company for DELCORA, how Plaintiffs were to rectify the problem. He kicked the chair of the President of City Council Edward Mitchell and the meeting was adjourned.

73.On October 31, 2014, DELCORA employee Joseph Centrone left a phone message to Plaintiffs saying he would fix "their saddle" (the end of the lateral that goes into the main sewer pipe). On October 13, 2015 he came to the premises and said DELCORA would pay to have Plaintiffs' saddle fixed. No expert told Plaintiffs that their saddle needed to be repaired and the video of the saddle was according to Thomas Kennedy "inconclusive."

74.On or about September 11, 2015, Plaintiffs received a letter from their insurer, Safeco Insurance, stating "we were recently informed that your dwelling has an improper sewer system. In order for us to continue your policy, please forward proof of repairs by 11/11/2015. You will need to provide repair receipts and photos indicating all issues that have been repaired. Failure to provide evidence of repairs will constitute a substantial increase in hazard insured against by reason of willful or negligent acts by you and will result in the non-renewal of your policy."

75.After counsel sent a request for videos taken on Plaintiffs' property, counsel for DELCORA between December 15 and 31, 2015 sent a video that either was not from,or showed no defect within, Plaintiffs' property,

76.UB Employees Thomas Kennedy (Plumber), Parker Ferguson, UB Building Inspector, Charles Catania (Engineer),  and Robert O'Connor, UB solicitor, and DELCORA employees Joseph Centrone and Robert Powell, knew that DMM complained about the easement, and tried to convince Plaintiffs the problem was on their property, not outside it.

77. On April 2, 2014, Plaintiff DMM flushed the toilet while a camera was filming the saddle. The camera showed the saddle was not leaking.

78. In June 2014 Charles Catania told Plaintiff DMM that someone didn't listen to him about the construction of Plaintiffs' house. DMM told him the signature on the easement was not her sister's.. He walked away. Prior to this, he spoke to DMM many times at his office. After this, he refused to speak to her and never spoke to her again. In May of June 2014 DMM addressed him at a meeting of Upland Borough. He would not answer her.

79. On   June 2014, UB sent a letter stating DMM was cited for not having a shed permit for the shed on her premises to her counsel. DMM obtained the shed permit in 2001. DMM could not find the permit she obtained. UB normally keep records of permits. When DMM spoke to UB Borough manager Shirley Percival and she said UB did not have records of the permit. DMM got a new second permit. Then  DMM asked Cindy, UB employee Manager if they had records of permits and she printed out the first permit.

80. CJC was a member of the Upland Borough Council from the period ay 1990 until he died in 2016.

81. His company Catania Engineering Associates, Inc. (CEA) was referred many projects as a result of his position.

82. As an agent for  CEA,  CC had intimate knowledge of the easement and the conditions under which it was signed and by whom, who

notarized it, the problems on Plaintiff's premises, the efforts by

DELCORA and UB to try to cover up the fact that the water problems on

the premises were not caused by Plaintiffs but by the acts of omissions of

Defendants, and the need for the easement to obtain rights to build

infrastructure on or under the premises which were a major contributing

factor in bringing about the problems, and worked together with

DELCORA and UB to bring about the problems stated above.

COUNT 1:  RETALIATION FOR EXPRESSION OF IDEAS

83.The averments of paragraphs 1-82 are incorporated by reference.

Upland Borough filed the citation without probable cause, refusing after

repeated requests to provide evidence of the photographs or videotapes of the

alleged crack in Plaintiffs' pipes or any defect on the premises that caused the

problems stated above.

84.The citation was  filed in retaliation for Plaintiffs' complaining repeatedly

about the storm sewer and sanitary sewage problems on the premises, for

speech by Plaintiff BLG at the public meeting on October 1, 2011 and other

occasions to neighbors, other individuals and at UB meetings, complaining

about the forged easement document and the lack of any evidence of a cause

to the problems which was located on Plaintiffs' property,  and to intimidate

them from not investigating further into the cause or educating neighbors

with similar problems as to the cause of flooding onto their premises..

85. In June or July 2013 Plaintiffs had plumbers record videotapes of their

lateral pipes which showed there were no defects.These were given to Thomas

Kennedy. On June 13, 2013, Thomas Kennedy left a voice mail stating they showed a substantial crack.

86. On May 13, 2014 at an Upland Borough meeting DMM stated that she repeatedly saw the manhole in front of her property spewing water like a fountain, that Plaintiffs had a taped recording indicating her lateral was "fine," that there water "stunk" and claimed that the only time she got water in her house was when it came in through the municipal sewer lines.

87. Defendants' chilled speech protected under the First Amendment

88. Plaintiffs were engaged in constitutionally-protected activity.

89. The actions of Defendants caused Plaintiff DMM to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the activity of complaining in public about the water problems and doing investigation as to their cause.

90. Defendant Upland Borough issued or conspired together to cause to be issued a citation without probable cause or sufficient investigation to determine if a crime had been committed, substantially motivated as a response to Plaintiffs' exercise of constitutionally-protected conduct.

WHEREFORE, Plaintiff Denise M. Marusco Godfrey respectfully requests that the court enter judgment in her favor and against Defendant Upland Borough in an amount in excess of $150,000., plus costs and attorney's fees.

## COUNT 2: FRAUD

91. The averments of paragraphs 1-90 are incorporated by reference.

92. The easement was not what it purported to be because it purported to be signed by someone, DLM, who did not actually sign it.

93. The easement contains misrepresentations.

94. Defendants' misrepresentations are material to the transactions and problems stated above.

95. The statements in the easement that it was signed by the purported owner of the premises, by DELCORA representatives that there was no easement, by its employee Centrone DELCORA would fix "their saddle" (which infers it needed repair when the cause of the problem was known by DELCORA employees, who knew the saddle did not need repair and this would not significantly eliminate the water problems on the premises, to be outside of the premises) and repeated averments by Upland Borough employees including Thomas Kennedy about cracks or defects in Plaintiffs' lateral or other causes of the water problem on the premises being based on a defect caused by Plaintiffs or contained within their' premises, and averments in the citation were made falsely with knowledge of their falsity or recklessness as to whether they were true or false. CJC knew DLM did not sign the easement and knew that the signature purporting to be hers was not hers.

96. They were made with the intent of misleading Plaintiffs and other persons to rely on them.

97. There was justifiable reliance on the misrepresentation.

98. The resulting injury was proximately caused by the reliance.

99. Defendants DELCORA and Catania Engineering Associates, Inc. conspired to obtain an easement by misrepresentation.

100. Defendants DELCORA, Kennedy, Catania, Ferguson, O'Connor, Mitchell and Hunter, conspired together to misrepresent the cause of the problems on Plaintiffs' premises to make it appear there was a defect on the premises caused by Plaintiffs or contained within Plaintiffs' premises knowing the cause was increased water pressure and mixing of water from the storm sewer and sanitary sewer outside of the premises or caused by the pipes installed in the easement by DELCORA or some other cause not having to do with Plaintiffs, and all Defendants conspired together to legitimize & cover up the illegal easement.

WHEREFORE, Plaintiffs respectfully request the court enter judgment in their favor and against Defendants Centrone, Powell, Sucher, Catania Engineering Associates, Inc., Kennedy, Ferguson, Catania, Mitchell, and Hunter, jointly and severally, in an amount in excess of $125,000.

COUNT 3: MALICIOUS PROSECUTION

101. The averments of paragraphs 1-100 are incorporated by reference.

102. Defendants Kennedy, Ferguson, Catania, O'Connor, Mitchell, and Hunter spoke about and worked to file the charge of Certificate of Occupancy and Lateral Inspection against DMM. The Upland Borough Ordinance, adopted January 10, 2012, requires the owner to obtain a Certificate of Lateral prior to sale, §150-3(B), testing upon sale , §150-9, and after inspection, for the Borough Engineer to issue a Certificate of

Lateral Compliance once testing has proven compliance. §150-12. DMM was not required to comply because no sale was pending, she was a grantee, and did not seek to sell the premises with her husband after they bought it. Despite compliance, the Borough Engineer refused to issue a Certificate of Lateral Compliance. The Ordinance applies to grantors only and not to grantees. DMM has only been a grantee, on June 20, 2012. Defendants  Kennedy, Ferguson, Catania, O'Connor, Mitchell, and Hunter knew this but filed the charges anyway.

103. The proceedings terminated in Plaintiff DMM's favor. The charges were dismissed.

104. There was no probable cause for the filing of the charges.

WHEREFORE, Plaintiff Denise M. Marusco Godfrey respectfully requests that the court enter judgment in her favor and against Defendants Kennedy, Ferguson, Catania, O'Connor, Mitchell, and Hunter in an amount in excess of $125,000., plus costs and attorney's fees.

   COUNT 4: VIOLATION OF DUE PROCESS UNDER 14TH AMENDMENT

105. The averments of paragraphs 1-104 are incorporated by reference.

106. Defendants conspired together under color of state law to deprive Plaintiffs of the rights procured under the easement using a forged easement to obtain property rights for a state entity without notice or compensation, or a hearing, in violation of due process.

107. Defendants Centrone, Powell, Sucher, Kennedy, Mitchell, Ferguson, Hunter and O'Connor, perpetrated the frauds of their being some defect

on the premises of Plaintiff that caused the problems with water on their property to cover up the illegal procurement of the easement and refused to investigate Plaintiff's complaints of the forged easement.

108. Charles Catania represented Catania Engineering Associates, Inc. as well as DELCORA when he or someone at his request forged the signature of Deana L. Marusco and also was involved as a member of the Upland Borough Council in the decision to prosecute Plaintiff DMM without probable cause. He met with officials of DELCORA and Upland Borough dozens of times between 1991 and his death in January 2016 and participated in decisions with DELCORA and Upland Borough to have DMM prosecuted, to attempt to cover up the forged easement and prevent prosecution for or communication to the public of the forgery, to take the right under the easement without due process, to deceive Plaintiff and others that problems with their premises as stated above were the fault of a defect on their premises or a mistake they made and not due to the actions of Defendants, and to deprive Plantiffs of the fair market value of their premises without filing a court action to formally condemn the property even though a condemnation sign was placed by Upland Borough on the premises.

WHEREFORE, Plaintiffs seek judgment against Defendants Powell, Catania Engineering Associates, Inc. and Catania (as representative of DELCORA and Catania Engineering Associates, Inc.), jointly and

severally in an amount in excess of $125,000, for deprivation of rights under the 14th Amendment, counsel fees and costs.

COUNT 5: CLAIM UNDER CLEAN WATER ACT, 33 U.S.C. §1391(b).

109. The averments of paragraphs 1-108 are incorporated by reference.

110. Defendant DELCORA discharged, and. continues to discharge, pollutants, including sewage, into waters of the United States in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and the conditions and limitations of National Pollutant Discharge Elimination System ("NPDES") permits issued to DELCORA by PADEP, pursuant to Section 402(b) of the Act, 33 U.S.C.§ 1342{b).

111. DELCORA owns and operates a "treatment works" as that term is defined in Section 212(2) of the Act, 33 U.S.C. § 1292.

112.The purpose of the Act is to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

113. The Act establishes a national goal to eliminate the discharge of pollutants into navigable waters. 33 U.S.C. § 1251(a)(1).

114. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except, inter alia, as authorized by an NPDES permit issued by EPA or an authorized State pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

115. Section 502(1.2) of the Act, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

116. Section 502(6) of the Act, 33 U.S.C. § 1362(6), includes "sewage" in the definition of the term "pollutant.'°

117. Section 502(7) of the Act, 33 U.S.G § 1362(7), defines "navigable waters" to be the ``waters of the United States...”

118. Section 502(14) of the Act, 33 U.S.C. § 1362(14), defines "point source'' as "any discernible, confined and discrete conveyance ...from which pollutants are or may be discharged."

119. Section 402(q) of the Act, 33 U.S.C. § 1342(q), provides that each permit, order,or decree issued after December 21, 2000, for discharges from a municipal combined sewer system shall conform to EPA's Combined Sewer Overflow Control Policy ("CSO Policy"), 59 Fed. Reg. 1.868$ (April 19, 1994).

120. Section 402(a) of the Act, 33 U.S.C. § 1342(a), provides that the Administrator of the EPA may issue NPDES permits to authorize the discharge of pollutants into waters of the United States, subject to the conditions and limitations set forth in such permits.

121. Section 402(b) of the Act, 33. U.S.C. § 1342(b), provides that a state may establish its own permit program, and after receiving EPA's authorization. of that program, may issue NPDES permits within its jurisdiction.

122. On or about July 1, 1978, the Administrator of EPA authorized the Commonwealth of Pennsylvania to issue NPDES permits in Pennsylvania under the Clean Water Act, and the Commonwealth, through PADEP, does so in accordance with its Clean Streams Law, 35 P.S. § 691..1. et seq. The Commonwealth's authority to issue such permits has been in effect at all times relevant to this Complaint.

123. EPA retains concurrent enforcement authority pursuant to Section 402(1) of the Act, 33 U.S.C. § 1342(1).

124. 40 C.F.R. §§ 122-125 codify the regulatory requirements for the NPDES program.

125. 40 C.F.R. § 122.41 sets forth specific conditions applicable to all NPDES permits.

126. NPDES permits require the permittee to properly operate and maintain all facilities and systems of treatment and control. 40 C.F.R. § 122.41(e).

127. Combined sewer systems {"CSS") are wastewater collection systems owned by a State or municipality described to carry sanitary sewage (domestic, commercial and industrial wastewaters) and storm water (surface drainage from rainfall or snowmelt) through a single pipe to a POTW. CSO Policy, 59 Fed. Reg. at 18b89 (April 19, 1994). In periods of rainfall or snowmelt, total wastewater flows can exceed the capacity of the CSS and overflow directly to surface water bodies, such as lakes and

creeks. These overflows are called combined sewer overflows ("CSOs"). CSO Policy, 59 Fed. Reg. at 8691-94 (April 19, 1994).

128. The CSO Policy dunes a CSO as the discharge from a combined sewer system at a point prior to the sewage treatment plant that consists of mixtures of domestic sewage, industrial and commercial wastewaters, and storm water runoff. 59 Fed. Reg. 18691-94 (April 19, 1994).

129. The CSO Policy requires the submission of a "Long Term Control Plan." ("LTCP") to describe how the POTW will minimize or prevent CSOs and achieve compliance with the Act. Id.

130. Section II.C.4 of the CSO Policy requires, among other things, that the LTCP evaluate controls that would be necessary to achieve a range of overflow events per year,including zero overflow events per year or up to 100% capture, by making a reasonable assessment of cost and performance, sufficient to meet Act requirements. Id.

131. Section ILC.4 of the CSO Policy also requires, among other things, that the LTCP consider expansion of POTW secondary and primary capacity in the CSO abatement alternative analysis. Id.

132. Section II.C.S of the CSO Policy requires that Defendant's LTCP include cost/performance curves to demonstrate the relationships among the range of alternatives required under Section II.C.4 to determine where the increment of pollution reduction achieved diminishes compared to the increased cost (a.k.a. "knee of the curve analysis"). Id.

133. The CSO Policy requires permittees with CSOs to implement the Nine Minimum Controls ("NMCs"}, which are technology-based actions designed to reduce GSOs and their effects on receiving water quality. Id.

134. Section 309(b) of the Act, 33 U.S.C. § 1319(b), authorizes the EPA Administrator to commence a civil action to obtain appropriate relief, including an injunction, when any person discharges without a permit in violation of Section 301. of the Act,33 U.S.C. § 131.1., or violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

135. Pursuant to Section 309(4) of the Act, 33 U.S.C. § 1319(4), the Court may impose civil penalties up to $25,000 per day for each violation occurring prior to January 31, 1997.

136. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-41.0, enacted. October 5, 1990; 104 Stat. 890), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134, enacted Apri126, 1996; 110 Stat. 1321), EPA may seek civil penalties of up to $32,500 per day per violation on or after March 15, 2004, and $37,500 per day per violation occurring on or after January 12, 2009 (See 73 Fed. Reg. 75340, 75345) (Dec. 11, 2008) (78 Fed. Reg. 66647) (Nov. 6, 2013)), pursuant to 40 C,F.R. Part 19. Commonwealth to issue NPDES permits in Pennsylvania under the Clean Water Act, and the Commonwealth, through PADEP, does so in accordance with its Clean Streams Law, 35

P.S. § 691..1. et seq. The Commonwealth's authority to issue such permits has been in effect at all times relevant to this Complaint.

137. EPA retains concurrent enforcement authority pursuant to Section 402(1) of the Act, 33 U.S.C. § 1342(1).

138. 40 C.F.R. §§ 122-125 codify the regulatory requirements for the NPDES program.

139. 40 C.F.R. § 122.41 sets forth specific conditions applicable to all NPDES permits.

140. NPDES permits require the permittee to properly operate & maintain all facilities & systems of treatment & control_ 40 C.F.R. § 122.41(e).

141. DELCORA provides sewer service to parts of Delaware County, PA.

142.At all relevant times, DELCIORA has owned and operated the Western Regional Treatment Plant ("WRTP"), a "treatment works" as that term is defined in Section 212(2) of the Act, 33 U.S.C. § 1292, and 25 Pa. Code § 92a.2, and together with its associated collection system, a "publicly owned treatment. works'' ("POTW") as that term is defined in EPA regulations implementing the Act, 40 C.F.R. § 122.2 (see definition at 40 C.F.R. § 403.3(q)) and 25 Pa. Code § 92a.2.

143. The WRTP is located at 3201 W. Front Street, Chester, PA. It was built in 1974, originally designed to treat 44 million. gallons per day ("MGD"), and has been conditionally rerated by PADEP to receive 50 MGD upon the construction of a 455-foot outfall into the Delaware River.

144. The WRTP is a conventional activated sludge facility with primary and secondary wastewater treatment and disinfection by chlorine. The maximum daily design flow of the WRTP is approximately 105 MGD. In 201 Z, the average flow was 29 MGD. The maximum daily flow in 2012 was 62 MGD, recorded on December 21, 2012.

145. At all relevant times, DELCORA has owned and operated a collection system ("Collection System") that collects stormwater and wastewater from residential, commercial, and industrial sources, including but not limited to approximately 300,000 feet of combined sewers and 210,000 feet of separate sanitary sewers within the City of Chester.

146. Pursuant to contractual arrangements, DELCORA also treats wastewater at the WRTP that. is collected and. conveyed to the WRTP by means that DELCORA does not own.

147. DELCORA is authorized to discharge pollutants from the WRTP and. Collection system in accordance with DELCORA's NPDES Permits into Ridley Creek, Chester Creek, and the Delaware River.

148. Ridley Creek, Chester Creek, the Delaware River, Lukens Run and Marris Run  are each a "water of the United States'" for purposes of Section 502(7) of the Act, 33 U.S.C, § 1362{7), a `'water of the Commonwealth" within the meaning of Section 1 of the Clean Streams Law, 35 P.S. § 691..1, and are each located within the jurisdiction of the U.S. District Court. for the Eastern District of Pennsylvania.

149. At all times relevant herein, Defendant has "discharged," and continues to discharge, "pollutants" from its treatment works within the meaning of Sections 502(6) and (12) of the Act, 33 U.S.C. §§ 1362(6) and (12), and Sections 201 and 202 of the Cleans Streams Law, 35 P.S. §§ 691..201 and 691.202, from "point sources" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), into the waters of the United States.

150. Sewage, commercial and industrial waste, and their constituents are "pollutants" within the meaning of Section 506(6) of the Act, 33 U.S.C. § 1362(6), and within the meaning of "pollution" under Section 1 of the Clean Streams Law, 35 P.S. § 691.1.

151. The outfalls from which DELCORA discharges are "point sources" within the meaning of Section 502(1.4) of the Act, 33 U.S.C. § 1362(14}.

152. During certain rainfall events, the volume of wastewater entering the Combined Sewer System exceeds the hydraulic capacity of the sewers and/or the treatment facility. In those circumstances, the Collection System will discharge untreated combined sewage from. certain designated. outfalls, known as combined sewer outfalls.

153. When combined sewage discharges from a combined sewer outfall into a receiving water body, the event is known as a combined sewer overflow {"CSO")

154. The combined sewer outfalls from which DELCORA discharges are ``point sources'' within the meaning of Section 502(1.4) of the Act, 33 U.S.C. § 1362(14).

155. Pursuant to the CS4 Policy, 59 Fed. Reg. 18689 (April 19, 1994), CSOs are point sources subject to NPDES permit requirements, including both technology-based and water quality-based requirements of the Act.

156. Discharges from a sewage treatment plant are discharges from a point source that require an NPDES permit pursuant to Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342. Discharges from a CSO discharge point are discharges from a point source that require an NPDES permit pursuant to Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342.

157. At all relevant times, Defendant DELCORA's permits have authorized DELCORA to discharge pollutants only from specified point sources (identified in the permits as one or more numbered "outfalls") to specified waters of the United States and/or the Commonwealth, subject to limitations and conditions set forth in the NPDES Permits.

158. The combined sewage that DELCORA discharges from its combined sewer outfalls contains raw sewage, commercial and industrial waste from industrial users of the system, and storm water runoff.

159. Raw sewage and combined sewage contain viruses, bacteria and protozoa as well as other pathogens.

160. Infection with organisms contained in raw sewage can cause a number of adverse health effects ranging from minor illnesses such as sore throats and mild gastroenteritis (causing stomach cramps and diarrhea) to life-threatening ailments such as cholera, dysentery, infectious hepatitis, and severe gastroenteritis.

161. Children, the elderly, people with weakened immune systems, and pregnant women are at more risk for adverse consequences from such infections than the general population.

162. When raw sewage and combined sewage are discharged into waterways, bacteria consume organic matter in the sewage and consume oxygen dissolved in the water. When large amounts of sewage are discharged, dissolved oxygen levels can become severely depleted, resulting in the suffocation of oxygen-dependent aquatic life forms including fish, mollusks, and crustaceans.

163. Raw sewage and combined sewage contains high levels of nutrients like nitrogen and phosphorous. When such nutrients enter water ways in large amounts, they can fuel algal blooms that block the penetration of light through the water and thereby threaten aquatic plants that rely on photosynthesis for energy. When algae decays, it can consume dissolved oxygen in the same manner as the decomposition of sewage.

164. PADEP issued DELCORA NPDES Permit Number PA002~ 1.03, an or about March 30, 2007 ("2007 Permit"), with an expiration date of March 31, 2012. Without altering the expiration date, PADEP amended

the 2007 Permit on March 9, 2009 ("March 2009 Amended Permit"),
December 4, 2009 ("December 2009 Amended Permit"), and again on
September 28, 2011 ("2011 Amended Permit"). Part C, Section 15,
Subsection C of the March 2009 Amended Permit required DELCORA to
update its LTCP in accordance with the EPA ``Guidance For Long-
Term Control Plan (EPA 832-B-95-002)," dated September 1.995 ("LTCP
Guidance"), which implements the CSO Policy, and to submit the
updated LTCP to EPA. within 90 days of the March 9, 2009 issuance of
the March 2009 Amended Permit.

165. DELCORA did not submit the updated LTCP to EPA within 90 days
of the March , 2009 issuance of the March 2009 Amended. Permit.

166. On or about September 24, 2009, EPA. issued an Administrative
Order {"2009 Order") to Defendant pursuant to Section 309{a) of the Act,
33 U.S.C. § 1319{a), alleging that DELCORA failed to submit an updated
LTCP as required by the March 2009 Amended Permit.

167. The 2009 Order required DELCORA to submit an updated LTCP
conforming to the LTCP Guidance by February 1, 2010.

168. DELCORA did not submit. an updated LTCP by February 1, 2010 as
required by the 2009 Order.

169. On or about August 2, 2010, EPA issued a Notice of Noncompliance
and Request to Show Cause to DELCORA ("Show Cause Letter"). The
Show Cause Letter invited DELCORA to show cause why EPA should not
commence an administrative civil enforcement action to

compel permit compliance and assess a penalty.

170. On or about February 1, 2011, DELCORA submitted a revised LTCP ("2011 LTCP").

171. By letter dated September 14, 2011, EPA notified DELCORA that the 2011 LTCP did not meet the requirements of the 2009 Order or the CSO Control Policy.

172. Paragraph C.V.C.l . of the 2011 Amended Permit states: "DELCORA submitted the updated Long Term Control Plan to EPA on February 1, 2011. DELCORA shall continue implementation of the April 1999 LTCP and. July 2008 addendum to the LTCP until the updated plan is approved. Implementation of the updated plan shall result in compliance with water quality standards. The updated LTCP must be in accordance with the 1994 National CSO Policy." On or about April 1$, 2012, Defendant submitted a revised LTC' ("2012 LTCP").

173. By letter dated April 18, 2013, EPA informed. DELCORA that the 2412 LTCP did not conform to the requirements of the CSO Policy.

174. Following DELCORA's February 2012 application for renewal of its NPDES Permit, PADEP issued DELCORA NPDES Permit Number PA0027103 effective May 1, 2013 and amended on or about December 17, 2013 (effective January 1, 2014), expiring April 30, 2013 ("2013 Permit") 81. Paragraph C.V.C.1 of the 2013 Permit states: "DELCORA submitted the updated Long Term Control Plan to EPA on February 1,

2011. DELCORA shall continue implementation of the April 1999 LTCP and July 2008 addendum to the LTCP until the updated plan is approved. Implementation of the updated plan shall result in compliance with water quality standards, The updated LTCP must be in accordance with the 1994 National CSO Policy."

175. Each of DELCORA's NPDES Permits requires DELCORA to meet certain effluent limitations for discharges from. Outfall 001. at the WRTP, and prohibits discharges from the CSOs during dry weather.

176. Sewer water has entered onto the premises owned by Plaintiffs at time mentioned in the complaint, June 2013 (¶24), April 2004 or 2005 (¶14), as well as on other occasions, and will recur in the future during times of heavy rain, as a direct result of the violations by Defendant DELCORA of the Clean Water Act, the CSO Policy and of the effluent limitation in said permit.

177. The violation of the Clean Water Act is ongoing. DELCORA has refused to act to terminate the ongoing violation, despite requests by Plaintiff to meet to remedy the problem. Plaintiffs contacted the EPA but have been unable to get EPA to act to remedy the problems. On April 22, 2016, letters were sent certified mail to DELCORA, the EPA and the Pa Dept of Environmental Protection requesting that the problems with storm and sewer water entering Plaintiffs' premises be solved. This has not occurred. Plaintiffs have received no response to their letter as of September 19, 2016.

178. The Clean Water Act authorizes citizen suits for enforcement of National Pollution Discharge Elimination System Permits and other Clean Water Act violations.

179. In United States, et al v. DELCORA, No 15-4652 (E.D.Pa. 2015), on November 10, 2015, DELCORA entered into a consent decree regarding violations of the Clean Water Act within Delaware County and the same permit(s), admitting violations which may be relevant to this matter. Exhibit B. The Consent decree requires DELCORA to develop a plan, 5 years to develop the long-term control plan and 20 years to implement it. Plaintiffs even if the plan affected their property must wait as long as 20-25 years for their problem to be fixed.

180. On September 19, 2016, Marcello Mollo, counsel for the Department of Justice, Plaintiff in that case, stated that the consent decree does not address backup into private homes. He said he could not state whether the consent decree will help Plaintiffs with their problems. The consent decree does not address problems experienced by Plaintiffs, nor will it help them.

181. The violations affecting Plaintiffs are outside the scope of the government's investigation in that case. The government may have dilligently prosecuted the consent decree but did not diligently prosecuted the problems specific to Plaintiffs' property, their causes or the relief Plaintiffs need and seek.

WHEREFORE, Plaintiffs respectfully request that the court enter a declaratory judgment that DELCORA has violated the Clean Water Act, provide relief  permitted under the act including fines and injunctive relief, and enter judgment for costs and attorneys fees against Defendant DELCORA.

Date: December 1, 2016        s/J. Michael Considine, Jr.
                                   J. Michael Considine, Jr., P.C.
                                   1845 Walnut  Street, Suite 1300
                                   Philadelphia, PA.  19103
                                   (215)564-4000
                                   PA Attorney ID No. 37294
                                   Counsel for Plaintiffs